# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| MUSIC CITY COACH, INC., | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Case No. 3:10-cv-00115** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| STAR CITY COACH WORKS, LTD., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is a Motion to Dismiss or in the Alternative to Transfer Venue filed by the defendant Star City Coach Works, Ltd. ("Star City") (Docket No. 24). For the reasons discussed herein, the motion will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties to this dispute are involved in the commercial bus leasing business.[1] The plaintiff, Music City Coach, Inc. ("Music City"), is an Indiana corporation (with its principal place of business in Gallatin, Tennessee) that leases commercial buses to corporate clients and individuals. The defendant, Star City, is a Virginia corporation that designs and converts the interior of commercial buses to fit the specifications of a client.

In 2008, the plaintiff purchased from a third party a "H3-45 VIP BUS SHELL," VIN# 2PCV334938C711414 (the "bus"), for $627,756.00. (Docket No. 1 at 3.) In September 2008,

---

[1]Unless otherwise noted, the facts are drawn from the plaintiff's Complaint (Docket No. 1).

1

Music City and Star City entered into an oral contract, whereby Star City would "refurbish and convert the interior of the bus" pursuant to certain specifications. (*Id.*) On or about December 21, 2008, Music City (through an agent) delivered the bus shell to Star City's facility in Vinton, Virginia, so that Star City could begin work on the project. The oral contract called for Music City to pay $325,000 for this work (paid in three installments), and the project was to be completed by February 2009, at which time the final installment payment was due.

The parties also refer to the bus as the "Triple H Coach," in reference to the fact that, upon customization by Star City, the bus was to be leased by World Wresting Entertainment, Inc. ("WWE") for the use of one its wrestlers (Paul Levesque, a/k/a "Hunter Hearst Helmsley," a/k/a "Triple H") and his wife, Stephanie McMahon, who is an Executive Vice President for WWE. (Docket No. 24 Ex. 1 at 2.) The plaintiff alleges that, in light of its lease arrangement with WWE, "time was of the essence," that is, the bus needed to be completed quickly in order for Music City to meet its commitment to WWE. (Docket No. 1 at 3-4.)

Shortly after the bus was deposited with Star City, the parties agreed to push the completion date back to June 2009. However, on Star City's representations that the project was still proceeding basically as agreed, Music City sent the first two payments envisioned under the oral contract, totaling $216,666.66. The plaintiff alleges that June 2009 (and two months more) came and went without the project being completed.

In August 2009, the parties had additional discussions about the status of the still unfinished project. Music City maintains that Star City claimed that it could not finish the bus customization without additional funds, which Music City agreed to provide. Music City alleges that, in addition to the $216,666.66 already paid, it has advanced an additional $100,000 in funds

2

that were supposed to be used for the completion of the bus.

The plaintiff alleges that, in September 2009, it was contacted by Star City and advised that the bus conversion was complete. Music City representatives then traveled to Virginia to pick up the bus, only to find that "the bus conversion was not complete [and] it needed substantial work and components to be installed before it would be complete." (Docket No. 1 at 4.) According to the plaintiff, Star City again claimed that it did not have the funds (and, consequently, the manpower or components) to complete the project, and "as an emergency stop-gap measure," Music City provided employees and components, at its cost, to work on the Star City premises to help get the project completed. These employees claim that they have observed Star City employees removing components from the bus and putting them on other buses and not replacing the components.

On October 1, 2009, the owner of Music City, Gaylon Moore, contacted Mark Cardwell, who owns Star City, and advised him that he was on his way to view the bus. An argument erupted between the parties as to whether Moore was permitted to come onto the premises to view the bus, and Cardwell advised Moore that, if he attempted to come onto the premises, the police would be contacted, and Moore would be arrested for trespassing. The conversation ended with Cardwell telling Moore that (other than the employees on the premises working on the bus) no Music City employees were allowed on the Star City premises, and Star City would contact Music City when the bus was complete.

Over the next few months, Music City was only able to learn about the status of the bus from its employees in Vinton who were allowed to work on it. One of those employees, Randy Basham, submitted an affidavit, in which he stated that, on February 2, 2010, he heard that Star

3

City was going to stop work on the bus and was going to begin to dismantle it; Basham relayed this information to his bosses at Music City. (Docket No. 29 at 2.)

Believing that the bus conversion was about 95 percent complete but also believing that Star City had decided to stop working on the bus, Music City filed this lawsuit on February 3, 2010. The plaintiff sought a declaratory judgment in its favor, along with "monetary damages resulting from the Defendant's breach of contract, conversion of property, fraudulent or negligent misrepresentation, promissory fraud and damage to the Plaintiff's business reputation and customer goodwill," and punitive damages. (Docket No. 1 at 7.) It also sought a temporary restraining order (TRO) and preliminary injunction, directing the return of the bus and all components to Music City. (Docket No. 2.) Among other things, the plaintiff cited a "major media event" involving the lessee of the bus on March 28, 2010 as a basis for the TRO. (Docket No. 3 at 6.) The plaintiff alleged that failure to provide the bus for the lessee by this date would result in the loss of a major customer and perhaps the end of the plaintiff's business. (*Id.*) Judge Haynes of this court heard argument from the plaintiff (the defendant was not represented) at the hearing on the motion for a TRO on February 3, 2010, and he granted the TRO that day, providing the relief requested by the plaintiff. (Docket No. 8.)

On February 16, 2010, after the bus had been seized by U.S. Marshals, this court held a preliminary injunction hearing. The defendant was again not represented at the hearing, but, prior to the hearing, the defendant provided notice that, while it strongly objected to the results of the TRO hearing, it would not object to the conversion of the TRO into a preliminary injunction. (Docket Nos. 14, 19.) Therefore, the court converted the TRO into a preliminary injunction with the same terms as the TRO. (*Id.*)

4

On March 1, 2010, Star City filed the pending Motion to Dismiss, or, alternatively, to Transfer Venue. (Docket No. 24.) One of the defendant's primary arguments is that the court does not have personal jurisdiction over Star City. (*See id.*) In support of this position, the defendant has filed the affidavit of Mr. Cardwell, who states that all of Star City's "fabrication and installation" work is done at its facility in Vinton, Virginia and that "Star City has no offices, facilities, officers, employees, assets, bank accounts, [or] real or personal property in Tennessee." (Docket No. 24 Ex. 3 at 1-2.) Cardwell also states that "Star City does not solicit business in Tennessee and does not attend trade shows in Tennessee." (*Id.*)

Cardwell also claims that, as to matters related to the bus, he primarily negotiated with Terry Sims (Triple H's driver), not Music City, and that these negotiations were primarily conducted in person in Virginia. (*Id.*) Indeed, in-person "design consultation" meetings took place between Cardwell, Triple H, Ms. McMahon, and Sims either in Virginia or Connecticut, but not in Tennessee. (*Id.* at 3.) Cardwell recognizes that he "also communicated with Gaylon Moore of Music City Coach regarding this project." (*Id.* at 4.) These conversations were either in person in Virginia or on the phone, while Moore, presumably, was in Tennessee. (*Id.* at 4.)

Music City has submitted the affidavit of Mr. Moore, challenging Cardwell's claims that Star City has limited connection to Tennessee. Moore claims that the parties have done business together since Music City was formed in 1997, and that, since 2004, Star City has built 12 of Music City's buses and, on more than 10 occasions since that time, Cardwell has visited Moore's office in Gallatin, Tennessee for various business matters. (Docket No. 27 at 1-2.) Moore claims that the oral contract in this case was negotiated by Music City and Star City "through numerous telephone conversations," and many "of these telephone calls were initiated by Mr.

5

Cardwell to [Music City's] Gallatin, Tennessee office." (*Id*. at 2.)

Moore also claims that, through his relationship with Star City and "other industry contacts," he learned that Star City does solicit business in Tennessee, and 80-85 percent of Star City's business originates in Tennessee. (*Id.* at 2.) Moore has "further found out" that Star City has recently performed work for several Tennessee individuals and companies, including All Access Coach Leasing and Acts Coach. (*Id.*) Moore maintains that Star City has built virtually all of these companies' buses and has made more than 10 deliveries to this district in conjunction with those building projects. (*Id.* at 2-3.)

## ANALYSIS

The defendant moves to dismiss the plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(5) (insufficient service of process), 12(b)(7) (failure to join indispensable parties), 12(b)(2) (lack of personal jurisdiction), and 12(b)(3) (improper venue). In the alternative, the defendant moves, pursuant to 28 U.S.C. § 1404(a), to transfer venue to the Western District of Virginia.

## I.     Insufficient Service of Process under Rule 12(b)(5)

The defendant primarily uses this section of its briefing to object to the lack of notice that it received before the TRO hearing. (Docket No. 24 Ex. 1 at 9-13.) The defendant also notes that its officers have yet to receive a copy of the Complaint from the plaintiff, but the defendant concedes that "Plaintiff [] sent a summons and a copy of the Complaint to Defendant's registered agent via certified mail" and that this package was received by its registered agent on February 8, 2010. (*Id.* at 9; Docket No. 24 Ex. 2.) The relevant inquiry, then, is whether it is sufficient to serve an entity such as Star City by delivering the summons and Complaint, via certified mail, to

6

its registered agent.

While Federal Rule of Civil Procedure 4, which governs service of process, does not explicitly provide for service of process by mail in this instance, in addition to providing for various methods of personal delivery, Rule 4 provides that an individual (or a business entity) may be served in a judicial district in the United States by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed R. Civ. P 4(e)(1); see also Fed. R. Civ. P. 4(h). Here, service was attempted in Virginia and the district court is located in Tennessee, meaning that, if service is sufficient under either state's procedural rules, this aspect of the defendant's motion should be denied.

The Tennessee Rules of Civil Procedure state that "service by mail of a summons and complaint upon a defendant may be made by the plaintiff, the plaintiff's attorney or by any person authorized by statute." Tenn. R. Civ. P. 4.04(10). Generally, the package must be actually received and signed for by the defendant or his "authorized agent," in order for service to be effective. See *Massey v. Hess*, 2006 WL 2370205, *3 (E.D. Tenn. Aug. 14, 2006). In the context of a partnership or corporation, an "authorized agent" may be a "partner," "officer," or "managing agent" of the entity, or another "agent authorized by appointment or by law to receive service" on the entity's behalf. Tenn. R. Civ. P. 4.04(3)-(4). Rule 4.05 permits out-of-state service by "any form of service" authorized for in-state service and explicitly permits out-of-state service by mail on a business entity by serving an agent "authorized by appointment." Tenn. R. Civ. P. 4.05.

While the defendant recognizes that the Tennessee rules are relevant here, it ignores the

7

statutory interplay cited immediately above, calls the manner in which the plaintiff elected to serve the defendant "extraordinarily troubling," and then launches into a lengthy discussion of how, in its opinion, the plaintiff "ambush[ed] and dragooned the United States District Court and the United States Marshals Service into its service by abusing civil process" in relation to the TRO. (Docket No. 24 Ex. 1 at 10-13.) The defendant suggests that the plaintiff's conduct surrounding the TRO hearing dictates that the "defects" in service of process are sufficient to dismiss the Complaint. (*Id.* at 14.)

As the defendant must recognize, the issue of whether the plaintiff's counsel acted properly with regard to the TRO hearing is entirely separate (and involves an entirely different analysis) from whether the Complaint should be dismissed because the defendant was not properly served with the summons and Complaint.[2] *See* Fed. R. Civ. P. 65(b). Every indication from the record is that the defendant's appointed, registered agent was timely served with the summons and Complaint via certified mail, and that, therefore, a permissible method of service under Tennessee law was invoked. (Docket No. 12.) The defendant's motion to dismiss under Rule 12(b)(5) will be denied.

## II.     Failure to Join a Party under Rule 12(b)(7)

The defendant also argues that the Complaint should be dismissed under Rule 12(b)(7) because the plaintiff has failed to "join parties under Rule 19." (Docket No. 24 Ex. 1 at 7; Fed. R. Civ. P. 12(b)(7)). It is well settled that the analysis of whether a Complaint should be

---

[2]It should also be noted that the plaintiff has filed, attached to the declaration of counsel Kevin Sharp, materials indicating that the Complaint and the motion for the TRO, along with other, related, materials were e-mailed to the defendant's registered agent and Mr. Cardwell about an hour before the hearing on the motion for the TRO. (Docket No. 28 Ex. 1.)

8

dismissed under Rule 19 involves a three-step process. *See PTG Logistics, LLC v. Bickel's Snack Foods, Inc.*, 196 F. Supp. 2d 593, 604-605 (S.D Ohio 2002).

The first step considers whether, under Rule 19(a), the party is "necessary" to the proceedings and, therefore, should be joined if joinder is feasible. *Id.* Rule 19(a) provides that "a person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if (a) in that person's absence, the court cannot accord complete relief among existing parties; or (b) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a). The second step, assuming that the party is "necessary," considers whether jurisdictional or venue issues would preclude the joinder of the party. *PTG*, 196 F. Supp. 2d at 605.

The final step, under Rule 19(b), considers whether the matter should be dismissed because the "necessary" party cannot be joined due to jurisdictional or venue issues. *Id.* That is, the court is to evaluate whether, "in equity and good conscience," the action should proceed or whether it should be dismissed. Fed. R. Civ. P. 19(b). The court is to consider, among other things, whether the absent party or the participating parties would be prejudiced by a judgment rendered in the absence of that party, whether an adequate judgment can be rendered, and whether the prejudice could be avoided by shaping the judgment and the relief. *Id.* Additionally, under Rule 19, the court is to apply a "pragmatic approach," considering whether, in light of all of the circumstances, "meaningful relief can [] be accorded." *Smith v. United*

9

*Brotherhood of Carpenters and Joiners of America*, 685 F. 2d 164, 166 (6th Cir. 1982).

The defendant makes no effort to apply Rule 19 or the three-step test. Rather, it files a copy of the title to the bus, which indicates that the bus is currently owned by an entity called American Lease Plans and that the Tennessee Commerce Bank has a lien on the bus. (Docket No. 24 Ex. 6.) The defendant relies on this document for the proposition that these other entities, along with the WWE, Triple-H, and Ms. McMahon, "are each interested, to varying degrees, in who has possession of the motor coach; its current condition, care, and maintenance; and whether the financial obligations relating to it are being honored." (Docket No. 24 Ex. 1 at 7-8.) The defendant concludes by arguing that, "although Defendant is moving to have Plaintiff's Complaint dismissed for failure to join these parties, Defendant believes these parties ought to be joined in anticipation of Defendant's planned counterclaim as Defendant intends to join them as third-party defendants." (*Id.*)

As can be seen from the clear text of Rule 19, the mere speculation that a party may have "an interest" in the litigation is insufficient to dismiss the matter under Rule 12(b)(7). Moreover, the defendant makes no effort to argue how a "pragmatic approach" would dictate dismissal. As indicated above, while the plaintiff apparently took possession of the bus following the TRO, this case remains a breach of contract (and related tort claim) dispute surrounding the customization of the bus. On the claims in the plaintiff's Complaint, there is no reason to believe that the lien holder or title holder to the bus would have any significant interest in that dispute, let alone an interest so significant that they must be joined to this litigation to avoid its dismissal. As the plaintiff states, "under the defendant's theory, if a lessor of an office build[ing] sued a roofing contractor . . . for defective work, the lessor must also join the title

10

owner to the building, any mortgagees, and all of the tenants in order to proceed . . . the practical effect [of which] would be to make simple contract disputes extraordinarily complex and burdensome." (Docket No. 26 at 17.) Clearly, the defendant has fallen well short of effectively stating its case here, and the Complaint will not be dismissed on Rule 12(b)(7) grounds.

### III. Lack of Personal Jurisdiction under Rule 12(b)(2)

The defendant also contends that this case should be dismissed because there is no personal jurisdiction over Star City in Tennessee. (Docket No. 24 Ex. 1 at 4.) A court deciding a motion to dismiss for lack of personal jurisdiction has three options. It may (1) rule on the motion on the basis of the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *See Dean v. Motel 6 Operating LP*, 134 F.3d 1269, 1272 (6th Cir. 1998). It is in the court's discretion, based upon the circumstances of the case, which path to choose. *Id.* In any proceeding, however, the party asserting jurisdiction has the burden of proof. *See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). Additionally, in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Where, as here, both sides have submitted competing affidavits and requested a decision on that basis, it is entirely appropriate for the court to decide the jurisdictional issue based on the affidavits presented. *Id.* When a court rules on a motion to dismiss for lack of personal jurisdiction without the benefit of an evidentiary hearing or discovery, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion. *Id.* In examining whether the party asserting jurisdiction has made this *prima facie* showing, the court

11

is to construe the facts presented in the light most favorable to that party, and the court does not weigh or consider the conflicting facts presented by the other side. *Bird*, 289 F.3d at 871; *see also Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008)(referring to the plaintiff's burden in this context as "relatively slight").

In this diversity case, the issue of whether this court may exercise personal jurisdiction over Star City depends on the specific limitations of Tennessee's long-arm statute and the constitutional principles of due process. *Thomson*, 545 F.3d at 361. Tennessee's long-arm statute has been consistently construed to extend to the limits of federal due process, and, therefore, the two inquiries are merged, and the court need only determine whether exercising personal jurisdiction over Star City here is consistent with federal due process requirements. *Bridgeport Music, Inc. v. Still N The Water Publishing*, 327 F.3d 472, 477 (6th Cir. 2003).

In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, such as Star City, that defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417-18 (6th Cir. 2003)(quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction – a demonstration of the contacts necessary for either basis is sufficient to establish personal jurisdiction. *Id.*

Specific jurisdiction exists when a state exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. *Id.* General jurisdiction, on the other hand, exists when a defendant's contacts with the forum are

12

"substantial" and "continuous and systematic." *Id.* When personal jurisdiction is based on general jurisdiction, a state may exercise jurisdiction over a defendant, even if the suit does not arise out of the defendant's contacts with the state. *Id.*

In *Southern Machine Co. v. Mohasco Industries, Inc.*, the Sixth Circuit established a three-part test for determining whether the exercise of specific jurisdiction was consistent with the principles of due process. "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." 401 F.2d 374, 381 (6th Cir. 1968). While a motion to dismiss for lack of specific personal jurisdiction may be maintained based on prongs two and three of the *Mohasco* test, purposeful availment is the *sine qua non*, or absolutely indispensable, element of personal jurisdiction, and, therefore, disputes about whether or not there is specific personal jurisdiction in a given case often rise or fall on the issue of purposeful availment. *See Air Products and Controls, Inc. v. Safetech International, Inc.*, 503 F.3d 544, 550-51 (6th Cir. 2007).

### A.     Purposeful Availment

Before a defendant may be sued in a forum, the defendant must "purposefully avail" itself of the "privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)(internal citation and quotation omitted). This "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral

13

activity of another party or a third person." *Id.*

Purposeful availment is "something akin to a deliberate undertaking," that is, a deliberate effort by the defendant to direct its activities toward, and to make contact with, the forum. *Bridgeport Music*, 327 F.3d at 478 (internal quotation omitted). Purposeful availment exists "when the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Id.* (internal quotation omitted).

The Sixth Circuit has concluded that the mere fact that a defendant has a contract with a resident of the forum state is insufficient in itself to demonstrate purposeful availment. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722-23 (6th Cir. 2000). Rather, in determining whether the presence of a contractual and business relationship indicates purposeful availment, the court should consider "prior negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing." *Id.* (internal quotation omitted). Indeed, it is the manner in which the contract was negotiated and performed and the quality of the contact with the forum state, rather than the mere quantity of contacts or the duration of the relationship, that is relevant to the purposeful availment inquiry. *Id.* (holding that, while the defendant had phone, fax, e-mail, and in person contacts with the forum, the defendant "had contact with the state only because the plaintiff chose to reside there," that is, the defendant made no efforts to "further its business and create continuous and substantial consequences in the state.") .

For instance, in *Tharo Systems, Inc. v. Cab Produkttechnik GMBH & Co.*, 196 Fed.

14

Appx. 366 (6th Cir. 2006), the court looked at the "quality and quantity" of the defendant's contacts with the forum state to determine if, through the contractual relationship with the plaintiff, it set out "to create an ongoing business relationship" with the plaintiff in the forum state. *Id.* at 370-71. The court found that a few visits to the forum state, combined with "frequent negotiat[ions] with [the plaintiff] through telephone calls, e-mails, and faxes" directed to the forum state, along with the fact that the parties envisioned a long-term relationship and that they "communicated frequently after executing the [contract]," all indicated purposeful availment. *Id.*

From these Sixth Circuit cases and others, it is clear that the mere fact that a defendant contracted with an individual in the forum state and had the attendant correspondence in the course of contract formation is generally insufficient to confer personal jurisdiction over that defendant. *See Rice v. Karsch*, 154 Fed. Appx. 454, 462-63 (6th Cir. 2005). However, depending on their quantity and quality, additional contacts through the course of the contractual relationship may demonstrate purposeful availment. *See Tharo*, 196 Fed. Appx. at 371.

Here, while the defendant concedes that it "interacted with Plaintiff on the telephone regarding the progress of the project," it argues that this is insufficient to establish purposeful availment, particularly given that all in-person meetings were conducted outside of Tennessee. (Docket No. 24 Ex. 1 at 6.) In support of this position, the defendant relies on the *Condon v. Flying Puck* case. 35 Fed. Appx. 173, 174 (6th Cir. 2002). There, consistent with the case law discussed above, the Sixth Circuit concluded that there was no specific jurisdiction in Ohio over a California defendant, where the only connection between the employment contract dispute and Ohio was that the plaintiff read the job posting on the Internet from Ohio and exchanged "e-

15

mails, phone calls, and faxes" with "the defendant in California and the plaintiff in Ohio" before the "plaintiff signed an employment contract . . . and relocated to California." *Id.*

In response, the plaintiff argues that the defendant has "purposefully availed itself of the privilege of conducting business in Tennessee in several ways," the primary one being that the oral contract was formed by telephone while Music City representatives were in Tennessee; that is, during contract negotiations, the parties debated the terms of the customization while both parties were aware that one party was located in Tennessee and the other was located in Virginia. (Docket No. 26 at 12.) The plaintiff, without any citation to the record, also claims that "the terms of the agreement were memorialized in documents transmitted and/or mailed to Plaintiff in Gallatin, Tennessee." (*Id.*)

The court finds that the plaintiff has met its "relatively slight" burden of establishing purposeful availment. As discussed above, viewing the facts stated in the record in the light most favorable to the plaintiff, the plaintiff alleges that Star City knowingly entered into an oral contract with a Tennessee resident and may have sent certain confirmatory materials into Tennessee. Under the case law described herein, this alone would probably be insufficient to establish purposeful availment.

Additionally, however, after the oral contract was agreed to, the parties worked together for more than a year, primarily discussing the timing under which the project would be completed. These conversations became more tense and involved through the summer and early fall of 2009, when the bus project was still not completed, and the parties agreed that Music City would advance more money and lend some of its employees to work on the project. Then, in October 2009, after a dispute erupted, the defendant prohibited the plaintiff from viewing the

16

bus, ended informal communication with the plaintiff, and informed the plaintiff that it would send notice (that is, to Tennessee) once the bus was completed.  Therefore, in addition to merely entering into a contract with a Tennessee resident, the plaintiff has alleged that the defendant willingly became entangled in a lengthy and contentious dispute with a Tennessee resident, involving significant correspondence to and from Tennessee, the receipt of money and materials from Tennessee, and the receipt of services from the Tennessee resident's employees.

As noted above, the fundamental question here is whether the defendant's conduct toward the forum state was such that the defendant could "reasonably anticipate" being haled into court in the forum.  In light of the contract and the post-contractual entanglements discussed above, it is clear that the defendant could have "reasonably anticipated" that its contacts with individuals in Tennessee might be such that it would be haled into court here.  Therefore, purposeful availment is established.

### B.    "Arising From"

A cause of action "arises from" the defendant's contacts with the forum state when the cause of action has a "substantial connection" to the defendant's forum state activities, that is, "where a defendant's contacts with the forum state are related to the operative facts of the controversy."  *Tharo*, 196 Fed. Appx. at 371 (internal quotations omitted).  In the breach-of-contract context, the decisive issue is not where the alleged breach occurred (as Star City suggests), but whether the "operative facts" underpinning the plaintiff's claims can be connected to activities of the defendant's that were directed toward the forum state.  *Id.*

Here, the plaintiff alleges that, in addition to breaching its contractual obligations, the defendant engaged in promissory fraud, fraudulent or negligent misrepresentation, and

17

conversion of property. (Docket No. 1 at 2.) The "operative facts" underpinning these claims are directly connected to the defendant's activities in the forum; that is, the plaintiff alleges that the defendant breached the oral agreement that was reached while the plaintiff was in Tennessee, and that the defendant, in continuing to "reach out" to the plaintiff in Tennessee over the next year, made tortious misrepresentations about the status of the bus. (*See id.*) Therefore, the required "substantial connection" is shown, and this second prong of the specific jurisdiction test is met.

### C.  Reasonableness

Unless it is an "unusual case," if the first two prongs of the specific jurisdiction test are met, the reasonableness prong should be presumed satisfied, and the "specific assertion of personal jurisdiction is proper." *Tharo*, 196 Fed. Appx. at 372 (internal quotation omitted). Here, there is nothing to indicate (and the defendant suggests nothing) that this is an unusual case where, despite the established contacts, it is still unreasonable to exercise personal jurisdiction over the defendant, either because of the burden on the defendant or because of some other remarkable issue of convenience and judicial economy.[3] *See id.* The defendant has shown no particular burden here, and it does not rebuff Moore's claims that it does considerable other business in Tennessee. The third factor of the test is satisfied, and, therefore, the plaintiff has met its burden of establishing a *prima facie* case of personal jurisdiction. The defendant's

---

[3]Indeed, as to the third prong, the defendant simply argues that "subjection to personal jurisdiction in Tennessee would be fundamentally unfair given the paucity of connections" between the defendant and Tennessee. (Docket No. 24 Ex. 1 at 7.)

Motion to Dismiss under Rule 12(b)(2) will be denied.[4]

## IV.    Improper Venue Under Rule 12(b)(3)

The defendant also seeks dismissal under Fed. R. Civ. P. 12(b)(3), arguing that venue is improper in the Middle District of Tennessee.  (Docket No. 24 Ex. 1 at 14.)  However, the court's finding that there is personal jurisdiction over the defendant due to its activities *vis-a-vis* the plaintiff's business in Gallatin, Tennessee, which is within the Middle District of Tennessee, resolves the venue issue.  Under 28 U.S.C. § 1391(a), venue is proper in a diversity case in the "judicial district where [the] defendant resides."  And, under 28 U.S.C. § 1391(c), a corporate defendant, like Star City, is deemed to reside, for purposes of Section 1391(a), in any judicial district in which it is subject to personal jurisdiction at the time that the action is commenced. 28 U.S.C. § 1391(c).  The defendant's actions, which were sufficient to establish specific personal jurisdiction, were all directed at the Middle District of Tennessee, meaning that the defendant is subject to personal jurisdiction in this district and is deemed to reside there for venue purposes. Venue is proper and the defendant's Motion to Dismiss under Rule 12(b)(3) will be denied.

## V.    Transfer of Venue under 28 U.S.C. § 1404

Finally, the defendant argues that, even if none of its grounds for dismissal are viable, the court should still transfer this action to the Western District of Virginia pursuant to 28 U.S.C. § 1404.  (Docket No. 24 Ex. 1 at 18.)  Section 1404 states that, "[f]or the convenience of parties

---

[4] As indicated above, Moore, in his declaration, stated that the defendant had "continuous and systematic" contacts with Tennessee.  (Docket No. 27 at 2.)  The facts supporting this statement would be pertinent to the issue of whether there is general jurisdiction over the defendant here.  As the court concludes that there is specific jurisdiction over the defendant, it is not necessary to reach this issue.

19

and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

In determining whether to transfer a case pursuant to Section 1404(a), a district court should consider a number of "case-specific factors," including the existence of a forum selection clause, as well as "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moses v. Business Card Exp.*, 929 F.2d 1131, 1136-37 (6th Cir. 1991).

The defendant argues that the "deciding factor" here is the "convenience of parties and witnesses." (Docket No. 24 Ex. 1 at 18.) The defendant claims that, in addition to Mr. Cardwell and other senior Star City representatives, it had fifteen employees work on the bus. (*Id.* at 19.) Because these fifteen employees are the only individuals who can describe the work performed on the bus, the "defendant cannot successfully rebut the charges by Plaintiff without calling these witnesses." (*Id.* at 19.) However, the defendant argues, "it would be a great hardship on Defendant to lose fifteen employees from his workforce to testify [in Nashville] 440 miles away from their worksite," particularly because "any such witness would likely spend two days in round-trip travel in addition to whatever time they would need to wait until being called for testimony." (*Id.* at 19-20.) While a Nashville trial would be very inconvenient for its employees, the defendant argues that representatives from Music City (including Mr. Moore) have demonstrated that it is not a great hardship to come to Western Virginia, as they have done so "on many occasions to discuss the Triple-H Coach project," or to work on the project. (*Id.* at 19.)

20

In response, the plaintiff, through Moore's declaration, contends that it would suffer the same inconveniences that Star City identifies if its employees had to travel to Western Virginia for the trial of this matter. (Docket No. 27 at 3.) Moore's declaration identifies five Music City representatives (including Moore) who either worked on the bus or who dealt with Star City and administrative matters relating to the bus, all of whom might be called at trial. (*Id.*)

Accepting the defendant's premise that it would call all fifteen employees, the defendant has indicated that it would be more inconvenienced in this one area, as more Star City employees would have to travel from Western Virginia to Nashville than Music City employees would have to travel from Nashville to Western Virginia. That said, contrary to the defendant's suggestion that this is the "deciding factor," the convenience of witnesses is only one factor in the analysis. Indeed, while the convenience of all parties and potential witnesses is important, courts typically focus on convenience issues surrounding non-party witnesses, because it is generally presumed that party witnesses will appear voluntarily in either jurisdiction, but non-party witnesses, with no vested stake in the litigation, may not. *See Steelcase, Inc. v. Smart Tech, Inc.*, 336 F. Supp.2d 714, 720-21 (W.D. Mich. 2004). The defendant has made no showing that non-party witnesses will be inconvenienced, absent transfer. Nor has the defendant pointed to any of the other traditional rationales (including access to documents and proof, a forum selection clause, the interests of justice, the cost of litigation, or docket congestion) in support of its motion to transfer. *See Reese v. CNH America LLC*, 574 F.3d 315, 320 (6th Cir. 2009).

"Unless the balance" of the other factors "is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reese*, 574 F.3d at 320 (internal quotation omitted). Here, one factor among many favors the defendant in that, assuming this

case goes to trial and assuming that the defendant concludes that anyone from Star City who worked on the bus should be called, there are at least 15 witnesses who would be inconvenienced by traveling to Nashville to trial. The plaintiff has shown that transfer would produce a similar inconvenience, although affecting fewer witnesses. In light of all of this, the court cannot conclude that the balance is tipped so strongly in favor of the defendant that this is one of the "rare" cases in which the plaintiff's choice of forum should be disturbed. Therefore, the defendant's Motion to Transfer will be denied.

## CONCLUSION

For the reasons discussed herein, the defendant's Motion to Dismiss or in the Alternative to Transfer Venue will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge